**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| _____ ) | |
| ) | |
| 3 STEP SPORTS LLC, ) | |
| ) | Civil Action No.: _____ |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| VANGUARD ELITE ) | |
| VOLLEYBALL ACADEMY, LLC, ) | |
| CENTER COURT EVENTS, LLC, ) | |
| BRIAN MCCANN, BRIDGET CAREY, ) | |
| CHRISTINE A. MCCANN, ) | **JURY TRIAL DEMANDED** |
| NICOLE REELS, JOHN SCHOTT, and ) | |
| CHRISTOPHER SMITH, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |

## <u>VERIFIED COMPLAINT AND JURY DEMAND</u>

3 Step Sports LLC ("3Step" or "Company"), brings this action for breach of contract,

breach of fiduciary duties, tortious interference with business relations, trade secret

misappropriation, computer fraud, unjust enrichment, and conspiracy against defendants

Vanguard Elite Volleyball Academy, LLC ("VEVA"), Center Court Events, LLC ("Center

Court") (VEVA and Center Court are, collectively, the "Competing Companies"), Brian McCann

("McCann"), Christine A. McCann ("Ms. McCann", and together with McCann, the

"McCanns"), Bridget Carey ("Carey"), Nicole Reels ("Reels"), John Schott ("Schott"), and

Christopher Thomas Lynwood Smith ("Smith") (collectively, the "Defendants" and, with respect

to McCann, Ms. McCann, Carey, Reels, Schott, and Smith, the "Individual Defendants").

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

The Defendants have intentionally and maliciously caused, and continue to cause, significant and irreparable harm to 3Step's business, relationships, and reputation by, among other things, (a) conspiring with each other and with third parties, known and unknown, to flagrantly sabotage 3Step's business; (b) unfairly and unlawfully competing with 3Step in breach of multiple contractual and fiduciary obligations; (c) intentionally and unlawfully interfering with and, in some cases converting 3Step's business relationships with its clients, business partners, vendors, and facility managers; and (d) unlawfully misappropriating 3Step's trade secrets and commercially confidential business information.

## INTRODUCTION

1.      3Step is the nation's largest and most connected youth sports club and event operations company.

2.      The youth sports industry is a highly competitive, relationship-based industry where success depends, among other things, on initiative, goodwill, and teamwork.

3.      3Step's industry leadership was gained through hard work, a commitment to excellence, and substantial economic and personnel investments.

4.      Given the effort necessary to stay ahead of its competitors, 3Step diligently protects its trade secrets, commercially confidential and proprietary information, and innovations.

5.      This case arises out of the Individual Defendants' recent attempts—by, through, and with the Competing Companies—to unfairly compete with 3Step in the youth volleyball space, **<u>not</u>** through Defendants' own innovation or investment, but instead through their malicious interference with 3Step's coach, youth athlete, business partner, and sports facility

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

relationships and misappropriation of 3Step's trade secret and commercially confidential business information, in breach of multiple contractual, equitable, and fiduciary obligations.

6.     Defendants, collectively and with third parties acting in concert with them, secretly worked together—in breach of various contractual and fiduciary duties—to intentionally undermine 3Step's key partnership, coach, and facility relationships, while leveraging 3Step's good will, trade secrets, and commercially confidential business information to convert 3Step's partnership and facility relationships away from 3Step for Defendants' own benefit causing or immediately threatening to cause significant and irreparable damage to 3Step's current and ongoing business—with significant portions of Defendants' clandestine activities taking place while various of the Individual Defendants were employed by 3Step.

7.     As publicly available records on the Commonwealth of Pennsylvania's website for the Department of State confirm, VEVA was formed on March 18, 2025, and its publicly identified organizers comprise multiple former 3Step employees including, for example, Carey, Reels, Smith, and Mark Campion. True and correct copies of VEVA's Business Search listing and Certificate of Organization are attached as **Exhibits A** & **B**, respectively.

8.     Public records from the Pennsylvania Department of State also show that Center Court was organized the **same day as VEVA**, March 18, 2025, with the **same** registered office address at 529 Foundry Road, West Norriton, Pennsylvania 19403, and with a nearly identical group of organizers: Ms. McCann, Carey, Reels, Schott (rather than Smith) and Mark Campion ("Campion"). True and correct copies of Center Court's Business Search listing and Certificate of Organization are attached as **Exhibits C** & **D**, respectively.[1]

---

[1] The Court may, and is requested to, pursuant to FED. R. EVID. 201, take judicial notice of the facts set forth in paragraphs 7 & 8.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

9.    An additional identified co-conspirator is the Competing Companies' common founder and organizer Campion, also a former 3Step employee.

10.    Since inception, the Competing Companies have commercially marketed and promoted a stream of youth volleyball club team and competitive events: (a) that have been directly marketed to 3Step's customers; (b) that have sought to effectively replace 3Step's offerings at traditional 3Step sports facilities and venues; and (c) all of which are strikingly similar to 3Step's competing offerings.  Although youth volleyball ventures typically require significant investments of time and financial resources to get up-and-running, Defendants began marketing their competing products and services immediately upon the formation of the Competing Companies and, on information and belief, Defendants' marketing and promotion of their competing offerings began *before March 18, 2025 and, in many cases, <u>while various of the Individual Defendants were still employed by 3Step</u>*.

11.    VEVA and Center Court operate as interdependent and mutually reinforcing organizations where VEVA's club programs furnish the critical mass of teams that immediately legitimize Center Court's fledgling tournament brand. Though organized as separate Pennsylvania limited liability companies, the two entities were formed on the same day, share a West Norriton business address, and list virtually identical organizers—facts that underscore their deliberate 'one-enterprise' structure. The VEVA/Center Court business model, which closely tracks 3Step's ECP/Top Court Events model, depends on McCann—the architect and driver of 3Step's volleyball vertical and growth—whose industry-wide relationships across both club and tournament markets are indispensable to its success.

12.    Defendants' immediate market entry through the Competing Companies was made possible through the clandestine planning of the Individual Defendants, their intentional

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

actions and inactions aimed at sabotaging 3Step's business and ability to compete, and their misappropriation of 3Step's trade secrets and commercially confidential business information—largely and unlawfully while employed by 3Step.

13.    3Step has sustained significant damage to its business, athlete, family, and coach relationships, its business structure, its reputation, and current and expected revenue streams due to Defendants' intentional and malicious conduct and has **not** received the protection of the contractual consideration due to it from the Defendants as specified in more detail herein.

14.    3Step now seeks remedy for Defendants' injurious acts and/or omissions, including without limitation their unlawful and unfair competition, trade secret misappropriation, and tortious interference with 3Step's business relations.

## PARTIES

15.    3Step is a Delaware limited liability company with its corporate headquarters located at 500 Unicorn Park Drive, 5th Floor, Woburn, Massachusetts 01801.

16.    VEVA is a Pennsylvania limited liability company with a registered office at 529 Foundry Road, West Norriton, Pennsylvania 19403.

17.    Center Court is a Pennsylvania limited liability company with a registered office at 529 Foundry Road, West Norriton, Pennsylvania 19403

18.    Defendant Brian McCann is an individual who maintains a residential address at 437 Gulph Ridge Drive in King of Prussia, Pennsylvania with his wife (and co-defendant), Christine A. McCann.

19.    Defendant Christine A. McCann is an individual who maintains a residential address at 437 Gulph Ridge Drive in King of Prussia, Pennsylvania with her husband (and co-defendant), Brian McCann.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

20.    Defendant Bridget Carey is an individual who maintains a residential address at 2 Madison Drive in Spring City, Pennsylvania with Campion.

21.    Defendant Nicole Reels is an individual who maintains a residential address at 53 Schiller Avenue in Penn Valley, Pennsylvania.

22.    Defendant John Schott is an individual who maintains a residential address at 388 E. Nields Street in West Chester, Pennsylvania.

23.    Defendant Christopher Thomas Lynwood Smith is an individual who maintains a residential address at 1 Mactavish Court in New Castle, Delaware.

## JURISDICTION AND VENUE

24.    This action arises under a) the federal Defend Trade Secrets Act of 2016, 18 U.S.C. § 1832, *et. seq.*, b) the Pennsylvania Uniform Trade Secrets Act, 12 PA C.S.A. § 5301, *et seq.*("PaUTSA"), c) the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), and d) state law claims of breach of contract, breach of duty of loyalty, tortious interference with existing and prospective business relations, unjust enrichment, and conspiracy.

25.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836.

26.    The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a), because these claims are so related to claims in the action within original jurisdiction that they form part of the same case or controversy.

27.    This Court has personal jurisdiction over the Competing Companies because both entities, among other things, are headquartered in this District, transact business in this District and across Pennsylvania, and advertise, market, demonstrates offer to sell, and sell products and

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

services based on 3Step's trade secrets and commercially confidential information and business methods in this District.

28.     This Court has personal jurisdiction of McCann because, among other things, McCann resides and is domiciled in the Eastern District of Pennsylvania and effectuated many of the acts giving rise to this Complaint in the District.

29.     This Court has personal jurisdiction of Ms. McCann because, among other things, Ms. McCann resides and is domiciled in the Eastern District of Pennsylvania and effectuated many of the acts giving rise to this Complaint in the District.

30.     This Court has personal jurisdiction of Carey because, among other things, Carey resides and is domiciled in the Eastern District of Pennsylvania and effectuated many of the acts giving rise to this Complaint in the District.

31.     This Court has personal jurisdiction of Reels because, among other things, Reels resides and is domiciled in the Eastern District of Pennsylvania and effectuated many of the acts giving rise to this Complaint in the District.

32.     This Court has personal jurisdiction of Schott because, among other things, Schott resides and is domiciled in the Eastern District of Pennsylvania and effectuated many of the acts giving rise to this Complaint in the District.

33.     This Court has personal jurisdiction of Smith because, among other things, Smith is an organizer of VEVA, and effectuated many of the acts giving rise to this Complaint in the District.

34.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) & (c) because VEVA, Center Court, McCann, Ms. McCann, Carey, and Reels reside in the Eastern District of

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

Pennsylvania, all Defendants regularly transacted business that is the subject of this action in this District, and a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### Club Volleyball Business Structure

35.     Youth volleyball is one of the fastest growing youth sports in the United States, and a significant economic driver nationwide, generating millions of dollars in revenue per year for large operators like 3Step, sports facilities which host volleyball tournaments, and their respective business partners and vendors.

36.     The club volleyball season is cyclical, stemming from USA Volleyball ("USAV") and regional member chapter governance that club volleyball tryouts open annually in mid-July, and that clubs host camps and open-gym sessions throughout June and July to recruit players. For example, Philadelphia-area clubs operate under the Keystone Region Volleyball Association ("KRVA"), which permits tryouts for member club teams to begin annually on or about July 18. Competitive events and tournaments then typically occur from late September or early October through early summer. The volleyball tournament schedule follows this timeline each year, with tournaments operated through the fall and winter until each season wraps, typically sometime in June.

37.     Youth club volleyball businesses like VEVA demand significant financial and logistical commitment and planning, and events operators like Center Court require considerable lead time to stage a major volleyball tournament. For example, to operate a club program, an operator must recruit coaches for numerous athlete age and skill levels, host and advertise tryouts for teams, establish standard communication, marketing, financial, operational, and training protocols with customers, plan for, register, and manage the travel logistics for teams at all age

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

levels for regional and national volleyball tournaments. To operate tournaments and events, an operator must find and book sports facility venues large enough for multiple courts with open rental times for regular practices, compete for highly-coveted dates at convention centers and sports complexes, and market the events and solicit team registrations at all age levels. Each of these businesses require careful planning, forethought, and weeks to months, and sometimes years, of lead time. To capture the annual recruiting cycle and consistently execute each season smoothly, *successful club and tournament operators must be planning at least 6-24 months in advance*.

38.    Consistently organizing successful club programs requires, among other things, (a) significant advance planning; (b) development of, and reliance on, trusted coach, vendor, sponsor, and facility relationships; and (c) substantial financial outlay because of the tournament registrations, coach and vendor payments, and facility rental commitment costs, often in the hundreds of thousands of dollars for a robust program with numerous teams. Consistently organizing a successful event business requires, among other things, (a) significant advance planning; (b) development of, and reliance on, trusted vendor, sponsor and facility relationships; and (c) substantial financial outlay because of the vendor payments and facility rental commitment costs, often in the hundreds of thousands of dollars for a large tournament which attracts numerous teams.

### 3Step and the Acquisition of East Coast Power

39.    3Step provides events, training, camps, and related services to youth athletes and their families across the country in nine sports: baseball, basketball, combat, fastpitch softball, field hockey, football, lacrosse, soccer, and volleyball.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

40.    3Step's business involves securing venues for club sports events and camps, recruiting youth athletes to participate in its club programs, recruiting third party club programs to participate in its tournaments, and working with both licensors and corporate sponsors to operate a variety of branded events.

41.    One element of 3Step's successful business model is the acquisition and integration of complementary sports brands to expand its operational footprint, increase internal collaboration, and provide higher-quality and a greater variety of events and programs to its customers. In 2019, 3Step entered the volleyball market by acquiring the assets of Competitive Edge Sports ECP, LLC and East Coast Power Volleyball, LLC, a regional youth volleyball club and event operator originally based in King of Prussia, Pennsylvania and *then owned by the McCanns*.

42.    Through 15 additional volleyball business acquisitions completed between 2019 and 2023, 3Step is now one of the largest operators of youth volleyball events and club programs in the country.

43.    The acquisition model 3Step employs does not require a newly acquired sports program to rebrand, but 3Step instead preserves the existing grassroots brand and people to nurture the continued trust and relationships with its customers. 3Step's philosophy is to preserve and promote the relationships between players and their families with their coaches and club directors, as 3Step knows that parents entrust 3Step programs not only with their children's athletic training, but with their emotional and social development during formative years. In its business operations, a core 3Step goal is to ensure decisions are made by employees who keep in mind the impact those decisions have on the player and their family. This promotes continued trust in its customer relationships, which clearly transcend mere transactional interactions.

10

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

44.     Those acquisitions allowed 3Step to create two complementary business lines:

   a.   East Coast Power Volleyball ("ECP"), a seven-division eastern Philadelphia
        and Delaware-area volleyball club with roughly 80 teams and almost 1,000
        youth athletes, and

   b.   Top Court Events ("Top Court"), a nationwide youth volleyball tournament
        platform that now runs more than 30 annual volleyball events across regional
        tournament series, including the i) Northeast Power Series, ii) Florida Power
        Series, iii) Pacific Northwest Power Series, and iv) a series of "Top Court
        National" events.

45.     At the time of 3Step's acquisition, ECP was a successful regional enterprise
founded and operated by the McCanns. 3Step's acquisition of ECP was synergistic; providing
the ECP employees with the operational, financial, and administrative support of a large multi-
sport event and club program organization.

## Brian McCann and His Employment at 3Step

46.     The McCanns founded ECP in 2013.

47.     In or about June 2019, McCann organized and registered a separate limited
liability company named East Coast Power Sports Consulting, LLC. McCann was the sole owner
of East Coast Power Sports Consulting, LLC.

48.     Evidencing McCann's understanding of the importance of (a) brand protection,
(b) employee duties of loyalty and confidentiality, and (c) the impacts of such matters on a club
volleyball organization, McCann—prior to 3Step's acquisition—required some, if not all, of his
ECP employees to execute confidentiality and non-solicitation agreements.

11

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

49.     On or about July 15, 2019, McCann caused East Coast Power Sports Consulting, LLC to enter into a consulting agreement (the "Consulting Agreement") with 3Step.

50.     Via the Consulting Agreement, McCann was obligated to, among other things, "assist, help generate and provide leads for continued and new business opportunities" for the benefit of 3Step.

51.     Shortly after execution of the Consulting Agreement, 3Step acquired substantially all of ECP's assets, with McCann personally receiving a substantial financial payout in connection with the transaction. Contemporaneously with 3Step's acquisition of ECP, McCann, Smith, and Reels (along with Campion) became employees of 3Step.

52.     McCann accepted a role as Volleyball Sport Director with 3Step and became the company leader for 3Step's volleyball programming, financial performance, and business development.

53.     McCann played a key role in growing 3Step's volleyball business.

54.     As Volleyball Sport Director, McCann was part of the top tier of 3Step leadership and was primarily responsible for, among other things, developing 3Step's volleyball business, including generating for 3Step the partner relationships necessary to secure nearly all of 3Step's subsequent volleyball asset acquisitions, and creating organic growth opportunities. McCann's responsibilities at 3Step gave him nearly unfettered access to 3Step's confidential business information including, for example, business development plans, current and prospective partnership and facility contacts, current and prospective client contacts, 3Step's financial and logistical resources necessary for operating large-scale volleyball events, employee and contractor information, and insights into all key operational aspects of the business.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

55.    In addition to McCann's access to 3Step's most confidential business information, McCann is also the common thread—in some sense, the team captain—connecting the other Individual Defendants. McCann personally hired each of them (except Ms. McCann), directly or indirectly oversaw them, cultivated their relationships, and is the only one with the deep, industry-level expertise required to build both the club and event sides of the business model.

56.    Though McCann himself is not named as a VEVA or Center Court organizer in those entities' respective organizational filings, his wife and business partner, Ms. McCann, is. On information and belief, McCann is utilizing Ms. McCann as the straw person through whom he owns, operates, and guides the VEVA and Center Court businesses.

57.    McCann is a long-time friend and co-worker of co-conspirator Campion, and they jointly developed 3Step's Top Court brand offerings. Top Court generates millions of dollars in revenue for 3Step and has enormous brand value in the volleyball tournament space through partnerships with other volleyball programs and with companies, like Under Armour.

58.    Carey is a longtime friend and co-worker of McCann, and she shares a residence (and status as a VEVA and Center Court organizer) with McCann's other longtime friend and co-worker, Campion.

59.    Reels is McCann's longtime friend and co-worker, having been employed by McCann at ECP when it was acquired by 3Step and subsequently joining McCann at 3Step.

60.    Schott is a long-time co-worker of McCann – and fellow Center Court organizers Campion, Carey, and Reels – having been employed by McCann to join the Top Court division at 3Step as Event Sales Coordinator for Top Court tournaments.

61.    Smith was hired by McCann as Manager of Club Operations at ECP shortly before ECP was acquired by 3Step, and Smith continued working with McCann after the

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

acquisition until Smith left 3Step in October 2023 to start a competing club volleyball program. Less than a year later, in July 2024, McCann re-hired Smith to be 3Step's Director of ECP Club Operations and they worked together until McCann left approximately two months later.

62.     As a condition of his employment with 3Step, McCann reviewed and signed a Proprietary Information, Invention and Non-Competition Agreement (the "McCann Non-Compete"), which states in relevant part:

2.     <u>Non-Use.</u> Except as may be required by the Company in connection with and during my relationship with the Company, or with the express written permission of the Company signed by a duly authorized officer of the Company, I shall not: (i) either during my relationship with the Company or after that relationship terminates, whether voluntarily or involuntarily, directly or indirectly use, including, but not limited to, via Social Media, any Proprietary Information for my own benefit or for the benefit of another or in any way adverse to the Company's business interests; and (ii) during the period of my relationship with the Company, access any Proprietary Information that I do not have a need to know.

*     *     *

8.     <u>Non-Competition/Non-Solicitation:</u>

(a)     For the good and valuable consideration stated in this Agreement, I agree that while in the employ of the Company, I shall not, without prior written approval of the Company, directly or indirectly, as an individual proprietor, partner, stockholder, officer, employee, director, joint venture,

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

investor, member, principal, lender, consultant, independent contractor, or in any other capacity engage in any activity on behalf of any business or entity that is in competitive, directly or indirectly, with the business of the Company.

(b)    For the consideration expressly stated in paragraph (c) below herein, I agree that, for a period of two (2) years after the termination of my employment (the "Restricted Period"), I shall not, without prior written approval of the Company, directly or indirectly, as an individual proprietor, partner, stockholder, officer, employee, director, joint venture, investor, member, principal, lender, consultant, independent contractor, or in any other capacity (i) provide the specific type of services that I provided to the Company in the last two (2) years of my employment with the Company (collectively, the "Products And Services") to or on behalf of any business within the geographic areas in which I, during any time within the last two (2) years of my employment, provided services or had a material presence or influence (the "Restricted Area") or (ii) own, control, or manage any business or activity that is competitive with the Company in the provision of the Products And Services in the Restricted Area, provided, however, that the record or beneficial ownership of five (5) percent or less of the outstanding publicly traded capital stock of any entity shall not be deemed, in and of itself, to be in violation of this Section.

(c)    I and the Company mutually agree that the offer of continued employment and all of the terms and conditions of that offer and my employment that follows constitute consideration for the noncompetition covenant set forth in paragraph (b) above. By acceptance of that offer, execution of this Agreement and commencement of employment, I acknowledge that the consideration I am receiving constitutes fair and reasonable consideration for said noncompetition covenant.

(d)    For the good and valuable consideration stated in this Agreement, I agree that while in the employ of the Company, and for a period of two (2) years thereafter, I shall not, without prior written approval of the Company, directly or indirectly, as an individual proprietor, partner, stockholder, officer, employee, director, joint venture, investor, member, principal, lender, consultant, independent contractor, or in any other capacity (1) recruit, solicit, or hire any employee, consultant, agent, director or officer of the Company or contact, recruit, solicit or induce, or attempt to contact, recruit, solicit or induce, any employee, consultant, agent, director or officer of the Company to terminate his/her employment with, or otherwise adversely change, reduce, or cease any relationship with, the Company; or (3) contact, solicit, divert, take away, or attempt to contact, solicit, divert or take away, any clients or accounts, or prospective clients or accounts, of the Company, or any of the Company's business with such clients or accounts, except as agreed upon in writing signed by a duly authorized officer of the Company. Nothing herein shall preclude me from purchasing or owning not more than one percent (1%) of the total outstanding stock of a publicly-held company with securities traded on a nationally recognized securities exchange.

63.    Despite these contractual obligations, while working at 3Step, McCann, in concert with the other Individual Defendants and Campion, intentionally failed to fulfill critical job responsibilities, improperly misappropriated 3Step trade secrets and other highly confidential commercial business information – such as, for example, client and prospective client information – and, at least as early as May 2024, used 3Step's time and resources to pursue third-party endeavors and investments for McCann's personal gain – such as, for example, repeatedly meeting, and ultimately, investing with third-parties to establish the Epi-Center, a new

15

volleyball, basketball, and pickleball facility in South Strabane Township, Pennsylvania competitive with 3Step's business. Notably, in March and April 2025, McCann – who was fully aware that Campion was still a 3Step employee – invited Campion to join several calls with various Epi-Center investors, conduct that squarely violates the terms of the McCann Non-Compete.

64.     The McCann Non-Compete contains reasonable temporal and geographic limitations. McCann was represented by counsel throughout the negotiation and finalization of the ECP asset purchase, and McCann knowingly agreed to those terms in exchange for significant payout consideration and compensation. All 3Step required was that he refrain from using the same information and connections he used to build the 3Step volleyball vertical to compete with 3Step in a clearly defined space for a limited time. Despite these reasonable restrictions, on information and belief, McCann has leveraged, directly or indirectly, 3Step's confidential and proprietary trade secret and commercially confidential information to enable sales by the Competing Companies to 3Step customers.

65.     McCann was employed at 3Step until his employment was terminated on or about September 24, 2024.

66.     Upon the termination of McCann's employment with 3Step, he executed a separation agreement (the "McCann Separation Agreement") with 3Step in which McCann, in exchange for a significant severance payment (in excess of $200,000), acknowledged and agreed that (a) the terms of the McCann Non-Compete would remain in effect, and (b) he would, among other things, promptly deliver to 3Step all of 3Step's proprietary information, including all copies thereof.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

67.     Despite McCann's contractual and fiduciary obligations to 3Step and despite his representation that he would abide by those obligations, McCann, directly or indirectly and in concert with the other Defendants and Campion, conspired to sabotage 3Step's relationships and revenue by, for example, failing to secure facilities for future and upcoming events, interfering with 3Step's relationships with its employees, partners, vendors, facilities, coaches, and clients, and misappropriating, destroying, or preventing access to, 3Step's confidential business information.

### Nicole Reels and Her Employment at 3Step

68.     McCann hired Reels to work at ECP on or about August 19, 2019.

69.     Shortly after 3Step acquired substantially all of ECP's assets in late October 2019, Reels accepted employment with 3Step.

70.     While employed at 3Step, Reels' responsibilities included serving as the lead club administrator initially for ECP and eventually for all of 3Step volleyball, which required her to, for example (a) develop intimate knowledge of 3Step's business, including the logistics and maintenance of club and player registrations; (b) build and maintain for 3Step's benefit, internal and external relationships with clubs, teams, coaches, facilities, vendors, and partners; (c) manage and assist other 3Step volleyball brands with managing payments and issues with coaches, referees, facilities, parents, players, vendors and partners; and (d) coordinate on behalf of 3Step volleyball brands with internal 3Step back-office functions like Tech, Operations, Marketing, Legal, and Finance to ensure efficient invoice payments, volleyball brands' financial performance, contract management, customer support, and cross-functional process management.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

71.     As a result of her employment at 3Step, Reels had regular access to confidential

3Step trade secrets including, for example (a) data and information relating to present and future

product and service offerings; (b) business marketing and operational models; (c) revenue and

profit forecasts; (d) customer personal data; and (e) 3Step's business with specific vendors and

business partners.

72.     As a condition of her employment with 3Step, Reels reviewed and signed a

Proprietary Information and Invention Agreement (the "Reels Confidentiality Agreement"),

which included the following provisions:

2.     <u>Non-Use</u>.  Except as may be required by the Company in connection with and during my relationship with the Company, or with the express written permission of the Company signed by a duly authorized officer of the Company, I shall not: (i) either during my relationship with the Company or after that relationship terminates, whether voluntarily or involuntarily, directly or indirectly use, including, but not limited to, via Social Media, any Proprietary Information for my own benefit or for the benefit of another or in any way adverse to the Company's business interests; and (ii) during the period of my relationship with the Company, access any Proprietary Information that I do not have a need to know.

*          *          *

3.     <u>Property of Company</u>.  I agree that all agreements, memoranda, notes, records, drawings, manuals, programs, codes, procedures, formulas and any other materials belonging to the Company concerning, without limitation, (i) any process or product designed, programmed, manufactured, used, developed, modified, investigated or considered by the Company (ii) any method of doing business by the Company; (iii) any customer or employee of the Company; (iv) any copyrights, programs, designs, codes or other Proprietary Information belonging to the Company or any of its customers; or (v) any other Company activity, are and shall be the exclusive property of the Company and shall be delivered, along with all copies thereof, to the Company upon termination of my relationship with the Company or at any other time upon request.  I agree that upon termination of my relationship with the Company, I shall remove from my personal Social Media any designation or indication that I am currently affiliated with the Company.

*          *          *

15.     <u>No Conflicting Obligation</u>.  I hereby represent and warrant to the Company that I (i) am not presently under and will not in the future become subject to any obligation to any person, entity or prior employer which is inconsistent or in conflict with this Agreement or which would prevent, limit or impair in any way my performance of my relationship with the Company and (ii) have not disclosed and will not disclose to the Company, nor use for the Company's benefit, any confidential information and trade secrets of any other person or entity, including any prior employer, or unless such disclosure is expressly permitted by any agreement with such entity, person or prior employer.

18

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

73.     Despite Reels' contractual and fiduciary obligations to 3Step, and despite her representation that she would abide by these obligations during and after her employment with 3Step, Reels, in concert with the other Defendants and Campion, breached her obligations to 3Step by, among other things, (a) misappropriating and leveraging 3Step trade secrets and other confidential and proprietary 3Step information to advance the Competing Companies' business interests in direct competition with 3Step; (b) soliciting, directly and indirectly, 3Step coaches, employees, vendors, and facilities away from 3Step to instead work with or for the Competing Companies; (c) using, without authorization, 3Step trade secrets and confidential business information to interfere with 3Step's relationships with its clients and potential clients; and (d) deleting or destroying, without authorization, 3Step files and information on a Company-owned laptop issued to Reels.

74.     Reels was employed at 3Step until she resigned and terminated her employment on or about February 28, 2025—*less than three weeks before Reels registered VEVA and Center Court as business entities* in concert with Carey, Campion, Ms. McCann, Smith (for VEVA) and Schott (for Center Court).

75.     Reels, directly or indirectly and in concert with the other Defendants and Campion, conspired to sabotage 3Step's relationships and revenue by, for example, interfering with 3Step's relationships with its other employees, partners, facilities, vendors, coaches, and clients, and misappropriating, destroying, or preventing access to, 3Step's confidential business information.

### John Schott and His Employment at 3Step

76.     Schott commenced employment with 3Step on or about September 14, 2020, in the position of Event Sales Coordinator for Top Court.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

77.     While employed at 3Step, Schott's responsibilities included (a) driving team registrations for Top Court tournaments by establishing and maintaining relationships with youth volleyball club programs; (b) promoting upcoming tournaments via phone, text, email and social media; (c) developing and managing a sales pipeline to meet or exceed team registration goals for each event; (d) serving as the main point of contact for assigned clubs through the registration, pre-event and post-event processes; (e) maintaining accurate records of outreach, conversations and commitments for the Top Court division; and (f) assisting with on-site event execution as needed.

78.     As a result of his employment at 3Step, Schott had access to confidential 3Step trade secrets including, for example, (a) data and information relating to present and future product and service offerings, (b) business models, (c) marketing forecasts, and (d) 3Step's business with specific clients, including club program team needs, payments, requirements, and future product utilization.

79.     As a condition of his employment with 3Step, Schott reviewed and signed a Proprietary Information and Invention Agreement (the "Schott Confidentiality Agreement"), which included the following provisions:

2.      <u>Non-Use</u>.  Except as may be required by the Company in connection with and during my relationship with the Company, or with the express written permission of the Company signed by a duly authorized officer of the Company, I shall not: (i) either during my relationship with the Company or after that relationship terminates, whether voluntarily or involuntarily, directly or indirectly use, including, but not limited to, via Social Media, any Proprietary Information for my own benefit or for the benefit of another or in any way adverse to the Company's business interests; and (ii) during the period of my relationship with the Company, access any Proprietary Information that I do not have a need to know.

*       *       *

20

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

15.   <u>No Conflicting Obligation</u>.  I hereby represent and warrant to the Company that I (i) am not presently under and will not in the future become subject to any obligation to any person, entity or prior employer which is inconsistent or in conflict with this Agreement or which would prevent, limit or impair in any way my performance of my relationship with the Company and (ii) have not disclosed and will not disclose to the Company, nor use for the Company's benefit, any confidential information and trade secrets of any other person or entity, including any prior employer, or unless such disclosure is expressly permitted by any agreement with such entity, person or prior employer.

80.   Despite Schott's contractual and fiduciary obligations to 3Step and despite his representations that he would abide by those obligations, Schott, directly or indirectly and in concert with the other Defendants and Campion, conspired to sabotage 3Step's relationships and revenue by, for example (a) organizing Center Court while still employed with 3Step and with the intent to directly compete with 3Step using 3Step's trade secrets, confidential commercial information, goodwill, and reputation; (b) directly contacting 3Step customers to solicit their business away from 3Step; (c) soliciting other 3Step employees to entice them to leave 3Step and join VEVA and/or Center Court; and (d) interfering with 3Step's relationships with its employees, partners, vendors, coaches, and clients.

81.   Schott was employed at 3Step until he resigned in April 2025, ending his employment less than three weeks *after* he formed Center Court with Ms. McCann, Carey, Reels, and Campion. Upon the termination of his employment, Schott did not respond to 3Step's requests to engage in an exit interview.

82.   Schott's interference with 3Step's social media account access is one example of Schott and the other Defendants' calculated efforts to damage 3Step's business.

83.   As Event Sales Coordinator of Top Court, Schott directly managed 3Step's social media accounts for Top Court —including, for example, its @topcourtjack Instagram account — by connecting the accounts to his personal email rather than 3Step-issued email accounts. Schott did not transfer access to Top Court social media accounts to 3Step upon the termination of his

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

employment, even upon 3Step's direct request that he do so, and, to date, 3Step has not been able to regain access to this account.

84.     Schott, directly or indirectly and in concert with the other Defendants and Campion, conspired to sabotage 3Step's relationships and revenue by, for example, failing to secure facilities for future and upcoming events, interfering with 3Step's relationships with its other employees, partners, vendors, coaches, and clients, and misappropriating, destroying, or preventing access to, 3Step's confidential business information.

### Christopher Thomas Lynwood Smith and His Employment at 3Step

85.     On or about October 26, 2019, McCann employed Smith to work at ECP as a Manager of Club Operations.

86.     Shortly after 3Step acquired substantially all of ECP's assets from the McCanns in late October 2019, Smith accepted employment with 3Step.

87.     While employed at 3Step, Smith's responsibilities included managing all aspects of ECP's volleyball operations.

88.     As a result of his employment at 3Step, Smith had access to confidential 3Step trade secrets including, for example, data and information relating to present and future product and service offerings, business models, revenue and marketing forecasts, and 3Step's business with specific clients, including client needs, requirements, and future product utilization.

89.     As a condition of his employment with 3Step, Smith reviewed and signed a Proprietary Information and Invention Agreement (the "Smith Confidentiality Agreement"), which included the following provisions:

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

    2.    <u>Non-Use</u>.  Except as may be required by the Company in connection with and during my relationship with the Company, or with the express written permission of the Company signed by a duly authorized officer of the Company, I shall not: (i) either during my relationship with the Company or after that relationship terminates, whether voluntarily or involuntarily, directly or indirectly use, including, but not limited to, via Social Media, any Proprietary Information for my own benefit or for the benefit of another or in any way adverse to the Company's business interests; and (ii) during the period of my relationship with the Company, access any Proprietary Information that I do not have a need to know.

*       *       *

    15.    <u>No Conflicting Obligation</u>.  I hereby represent and warrant to the Company that I (i) am not presently under and will not in the future become subject to any obligation to any person, entity or prior employer which is inconsistent or in conflict with this Agreement or which would prevent, limit or impair in any way my performance of my relationship with the Company and (ii) have not disclosed and will not disclose to the Company, nor use for the Company's benefit, any confidential information and trade secrets of any other person or entity, including any prior employer, or unless such disclosure is expressly permitted by any agreement with such entity, person or prior employer.

    90.    Smith also received and acknowledged via his signature a copy of the 3Step

employee handbook (the "Handbook") which included the following provision:

You are to act in the best interests of the company, regardless of personal preference, and must not create the perception of personal advantage. An actual or potential conflict of interest occurs when an employee is in a position to influence a decision that may result in a personal gain for that employee or for a relative (related by blood or marriage, or a similar relationship).

    91.    Smith resigned from his employment with 3Step on or about October 3, 2023 to

operate a competing volleyball club program in Delaware.

    92.    Smith returned to employment with 3Step on or about July 9, 2024, when

McCann, then acting on 3Step's behalf as Sport Director of 3Step Volleyball, rehired Smith in

the role of Director of ECP Club Operations, a position in which Smith was responsible for

managing more than one hundred sixty regional and division coaches and directors.

    93.    In connection with his re-employment with 3Step, Smith signed an offer letter

indicating that he accepted certain terms of employment including, for example:

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

**No Conflict of Employment.** By accepting employment with 3STEP, you represent that you do not have any obligation to any third-party (including any current or prior employer) that would conflict with or prohibit your employment with the Company. You also understand that, in connection with employment with 3STEP, you are not permitted to use or disclose any third-party confidential, proprietary, or trade secret information.

94.     Also, in conjunction with his July 2024 rehire, Smith again indicated his acknowledgement and acceptance of the Handbook.

95.     Despite his contractual and fiduciary obligations to 3Step, while employed at 3Step in a significant position of trust and responsibility, Smith directly or indirectly, and in concert with the other Defendants and Campion, breached his obligations by, among other things (a) forming VEVA with Ms. McCann, Carey, Reels, and Campion; (b) soliciting, or causing the resignation of, at least seven 3Step coaches under Smith's supervision to leave 3Step for VEVA between the formation of VEVA on March 18, 2025 and the termination of Smith's employment with 3Step on May 14, 2025; (c) misappropriating and leveraging 3Step trade secrets and other confidential and proprietary 3Step information to advance VEVA business interests in direct competition with 3Step; (d) intentionally and maliciously in concert with the other Defendants and Campion, causing at least two of 3Step's facility relationships with its ECP BuxMont (named for Bucks and Montgomery counties, which are adjacent counties in Pennsylvania) and ECP Downingtown divisions to deteriorate and, ultimately, be converted to rented space for VEVA; (e) sabotaging 3Step's client relationship pipeline by failing to timely schedule and organize athlete tryouts for the 2025-26 season; (f) directly soliciting additional active 3Step coaches to leave 3Step and join VEVA; (g) failing to transfer access to 3Step's online client portal and social media accounts to other 3Step personnel; (h) on information and belief, causing an electronic communication to be sent to 3Step's ECP Delaware families falsely claiming that the ECP Delaware division was "rebranding" to VEVA; and (i) deleting or destroying, without

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

authorization, and/or preventing 3Step's access to 3Step files and information on a Company-owned laptop issued to Smith.

96.     Smith's interference with 3Step's online portal and social media account access is one example of Smith and the other Defendants' calculated efforts to damage 3Step's business.

97.     As Director of ECP, Smith indirectly or directly managed 3Step's social media accounts for ECP —including, for example, its @ecpowervball Instagram account, @ECPowerVBall X account, and "East Coast Power Volleyball" Facebook account—to his personal email or unapproved Gmail addresses rather than 3Step-owned email accounts. Smith did not transfer access to any of these ECP social media accounts to 3Step upon the termination of his employment, even upon 3Step's direct and repeated requests that he do so, and, to date, 3Step has not been able to regain access to *more than twenty* of its ECP-branded Instagram, X, Facebook and TikTok accounts.

98.     Also, a significant portion of the volleyball industry uses an online platform called Advanced Event Systems ("AES") to coordinate volleyball events. The AES system provides team and individual play rankings, which is an appealing feature to volleyball clubs and players. The ranking feature, among other things, has resulted in the AES system becoming widely used. For a volleyball club team to participate in most volleyball events, the club must be properly registered and documented in the AES system.

99.     Smith controlled 3Step's ECP club AES access until the termination of his employment with 3Step. As 3Step learned after the termination of Smith's employment, despite Smith's control of 3Step's ECP AES account and despite the termination of McCann's employment with 3Step in September 2024, McCann continued to be listed in AES as the ECP Director at least through the termination of Smith's employment.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

100.    Smith has not surrendered to 3Step or facilitated 3Step's access to the ECP AES account in breach of his contractual and fiduciary obligations to 3Step.

101.    Notably, VEVA has an active AES account that is registered with Smith's name and contact information and indicating that Smith's title at VEVA is "Director."

102.    Upon information and belief, Defendants, directly or indirectly, through Smith and/or Reels solicited and encouraged Dan Pringle ("Pringle"), a 3Step ECP coach since at least Fall 2023, to manage the facility relationship with XL Sports World ("XL Sports"), a Hatfield, Pennsylvania facility regularly used by ECP's BuxMont division teams, despite Smith's manager instructing him to directly manage facility relationships and rentals.

103.    Parents of ECP athletes, who are 3Step's customers, also received unsolicited text messages, including a text sent on or about May 3, 2025 announcing VEVA's formation, Pringle's involvement as director of VEVA's BuxMont division lead, and plans to operate at XL Sports, evidencing VEVA's efforts to raid 3Step's customer base.

104.    When 3Step reached out to XL Sports in late April 2025 to renew its rental times for upcoming tryouts and for the fall 2025 practice season, 3Step learned that XL Sports had reached out to Pringle at least six times since January 2025 to renew the rental times for ECP's 2025-26 season, with an additional direct request sent on or around April 30, 2025 to Smith, but received no response.

105.    During his engagement as an ECP division lead and coach, Pringle reported directly to Smith. Accordingly, Smith was either aware of the circumstances of Pringle's departure from ECP to join VEVA and failed to stop it or report it internally, or – more likely – solicited Pringle to defect to VEVA in order to start VEVA's BuxMont division with the very same practice facility, players and families in ECP's BuxMont division

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

106.    Smith and/or Reels, directly or indirectly on behalf of the Defendants, intentionally sabotaged 3Step's relationship with XL World via Pringle's involvement.

107.    Similarly, 3Step's customers in ECP's Downingtown division also received unsolicited text messages, including a message sent on or about May 6, 2025, announcing that two of ECP's Downingtown coaches were going to VEVA next season but staying in the division's rented United Sports facility, evidencing further efforts by VEVA to raid 3Step's customer base.

108.    3Step subsequently learned that Reels, on behalf of VEVA, had entered into a facility rental contract with United Sports for rental periods covering tryouts and fall practice times on or about April 17, 2025. Smith and/or Reels, directly or indirectly on behalf of the Defendants, intentionally sabotaged 3Step's relationship with United Sports via the involvement of the ECP Downingtown coaches.

109.    As an additional example of Smith's intentional acts and inaction directed to damaging 3Step's business and reputation, Smith committed at least one ECP team to the USA Volleyball Nationals ("USAV Nationals") event in Kansas City scheduled for late June 2025. Smith did so *without communicating these commitments* to the respective team coaches, Smith's direct 3Step supervisor, or other 3Step employees, knowing that if the team fails to participate in the USAV Nationals, the ECP club program could face governing body sanctions from USAV. Further, 3Step believes Smith shockingly took this action in retaliation to a conduct complaint asserted by the team coach against Smith, which complaint was investigated by 3Step and KRVA. Smith not only took this action to in effect ruin the sport experience for the children on the team in question, but deliberately and knowingly created significant risk that ECP may be sanctioned by USAV and, if sanctions are issued for the 2025-26 season, the sanctions may limit

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

ECP's ability to participate in premier tournaments that attract the top athlete talent. These consequences would further damage ECP and 3Step's reputations, customer reach, and financial performance for the 2025, 2026, and future seasons.

110.    3Step terminated Smith's employment *for cause* on May 14, 2025—nearly two months after Smith registered VEVA. 3Step terminated Smith's employment for, among other things, multiple violations of the Handbook, including but not limited to violations concerning conflicts of interest, confidentiality, and non-solicitation.

111.    Smith, directly or indirectly and in concert with the other Defendants and Campion, conspired to sabotage 3Step's relationships and revenue by, for example, failing to secure—and actively and unlawfully converting to VEVA—facilities for future and upcoming events, interfering with 3Step's relationships with its other employees, partners, vendors, coaches, and clients, and misappropriating, destroying, or preventing access to, 3Step's confidential business information.

## Bridget Carey and Her Employment at 3Step

112.    Carey was employed to work at ECP as a direct report to McCann on or about September 18, 2020, in the position of Volleyball Events & Operations Manager.

113.    While employed at 3Step, Carey's responsibilities included developing and marketing new and existing 3Step volleyball events, growing 3Step's national footprint through the implementation of new clubs and tournaments, and enhancing the 3Step brand through relationship development.

114.    As a result of her employment at 3Step, Carey had access to confidential 3Step trade secrets, including, for example, data and information relating to present and future product

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

and service offerings, business models, revenue and marketing forecasts, and 3Step's business

with specific clients, including client needs, requirements, and future product utilization.

115.    As a condition of her employment with 3Step, Carey reviewed and signed a

Proprietary Information and Invention Agreement (the "Carey Confidentiality Agreement"),

which states:

> 2.    <u>Non-Use</u>.  Except as may be required by the Company in connection with and during my relationship with the Company, or with the express written permission of the Company signed by a duly authorized officer of the Company, I shall not: (i) either during my relationship with the Company or after that relationship terminates, whether voluntarily or involuntarily, directly or indirectly use, including, but not limited to, via Social Media, any Proprietary Information for my own benefit or for the benefit of another or in any way adverse to the Company's business interests; and (ii) during the period of my relationship with the Company, access any Proprietary Information that I do not have a need to know.

*        *        *

> 3.    <u>Property of Company</u>.  I agree that all agreements, memoranda, notes, records, drawings, manuals, programs, codes, procedures, formulas and any other materials belonging to the Company concerning, without limitation, (i) any process or product designed, programmed, manufactured, used, developed, modified, investigated or considered by the Company (ii) any method of doing business by the Company; (iii) any customer or employee of the Company; (iv) any copyrights, programs, designs, codes or other Proprietary Information belonging to the Company or any of its customers; or (v) any other Company activity, are and shall be the exclusive property of the Company and shall be delivered, along with all copies thereof, to the Company upon termination of my relationship with the Company or at any other time upon request.  I agree that upon termination of my relationship with the Company, I shall remove from my personal Social Media any designation or indication that I am currently affiliated with the Company.

*        *        *

> 15.    <u>No Conflicting Obligation</u>.  I hereby represent and warrant to the Company that I (i) am not presently under and will not in the future become subject to any obligation to any person, entity or prior employer which is inconsistent or in conflict with this Agreement or which would prevent, limit or impair in any way my performance of my relationship with the Company and (ii) have not disclosed and will not disclose to the Company, nor use for the Company's benefit, any confidential information and trade secrets of any other person or entity, including any prior employer, or unless such disclosure is expressly permitted by any agreement with such entity, person or prior employer.

116.    Despite Carey's contractual and fiduciary obligations to 3Step and despite her

representations that she would abide by those obligations, Carey, directly or indirectly and in

concert with the other Defendants and Campion, conspired to sabotage 3Step's relationships and

29

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

revenue by, for example: (a) failing to secure facilities for future and upcoming events; (b) interfering with 3Step's relationships with its other employees, partners, vendors, coaches, and clients; and (c) misappropriating, destroying, or preventing access to, 3Step's confidential business information.

117.    Carey was employed at 3Step until she resigned and terminated her employment on or about April 2, 2025—*less than two weeks after Carey registered VEVA and Center Court as business entities* in concert with Reels, Campion, Ms. McCann, Smith (for VEVA) and Schott (for Center Court).

118.    Carey, directly or indirectly and in concert with the other Defendants and Campion, conspired to sabotage 3Step's relationships and revenue by, for example, failing to secure facilities for future and upcoming events, interfering with 3Step's relationships with its other employees, partners, vendors, coaches, and clients, and misappropriating, destroying, or preventing access to, 3Step's confidential business information.

119.    While employed at 3Step, Carey and Campion began a romantic relationship and eventually purchased a home together. They did not disclose this relationship to 3Step's Human Resources department.

120.    Indeed, Campion notified Human Resources and 3Step leadership in late February 2025 that he was stepping down from the VP role for the West region and self-selected to be Director of Top Court – which Company leadership thought was a curious step back for Campion. Campion also asserted that Carey was to be the Assistant Director of Top Court, reporting to him. Campion did not even update the HR system with his correct home address (as the one that he shared with Carey), until April 15, 2025, which was after he had delivered the notice of his resignation. Had 3Step been aware of the relationship between Carey and Campion,

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

it would not have permitted Carey to report to Campion in violation of its standard conflict of interest policies for employees.

121.    3Step only learned of the personal relationship between Campion and Carey after the wave of coordinated Top Court resignations began in March 2025. Given their relationship and shared residence, there is no plausible way Carey was unaware of Campion's actions. More likely, she was aware of, and actively involved in, his plans while still employed at 3Step

### Christine A. McCann's Role

122.    Ms. McCann founded ECP with McCann but did not become a 3Step employee after 3Step purchased ECP from the McCanns.

123.    On information and belief, Ms. McCann is knowledgeable about the logistics and operational requirements inherent in operating a volleyball club and event organization.

124.    On information and belief, Ms. McCann is aware that McCann executed both (a) the McCann Non-Compete and (b) the McCann Separation Agreement.

125.    Ms. McCann has personally benefited from the McCann Non-Compete and the McCann Separation Agreement, at least through (a) the financial consideration paid to McCann in connection with the ECP buyout, employment, and as severance and (b) McCann's continued employment and experience in the youth volleyball industry.

126.    On information and belief, Ms. McCann serves as a proxy organizer of VEVA and Center Court on McCann's behalf.

127.    On information and belief, an intended effect of Ms. McCann's role as a straw person named organizer of the Competing Companies *in lieu* of McCann is to create a layer of so-called plausible deniability shielding McCann's involvement in the Competing Companies and his concerted actions with the other Defendants.

31

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

**Defendants' Unfair Competition and Tortious Interference with 3Step**

128.    Between late February and late April 2025, at least five key 3Step volleyball employees—including Reels, Carey, Schott, and Campion—resigned in rapid succession, all of whom have ties to the Competing Companies. The timing and alignment of their departures strongly suggest a coordinated effort to destabilize 3Step's business from within.

129.    Defendants, in concert with each other and Campion, have intentionally and maliciously damaged 3Step's business in at least four major ways, including:

a.    Sabotaging or attempting to sabotage 3Step's facilities access and relationships;

b.    Misappropriating 3Step's trade secrets and commercially confidential business information to jumpstart Defendants' ability to directly compete with 3Step in the U.S. youth volleyball club and event spaces;

c.    Intentionally and maliciously interfering or attempting to interfere with 3Step's partner, employee, and client relationships; and

d.    Intentionally failing to diligently and loyally fulfill fiduciary and contractual obligations to 3Step in order to injure 3Step's business and convert relationships and revenue to VEVA and/or Center Court.

*Defendants' Failure to Secure Facilities*

130.    3Step continues to discover the breadth of Defendants' efforts both to interfere with the 3Step's existing and future business operations and to sabotage valuable corporate relationships, the latter of which already has resulted in a threat of legal action against 3Step.

131.    Although Defendants and Campion, individually and collectively, knew that 3Step's tournament events require significant lead times to secure venues in a highly competitive

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

marketplace, as of April 2025 the Individual Defendants and Campion had not begun the rental process, let alone secured renewal dates, for the vast majority of the over 30 event locations needed for 3Step's 2026 Top Court schedule.

132.    Shortly before their departure from the Company, Carey and Campion effectively admitted that the failure to secure venues was intentional during a transition meeting with 3Step's incoming Top Court Brand Director, Chris Hames ("Hames") on or about April 9, 2025. During that meeting, Carey and Campion advised Hames "not to take the job because everything is a mess" and acknowledged that no 2026 venues had been secured.

133.    On April 17, 2025—one day *before* Campion's resignation became effective and approximately two weeks *after* Carey resigned—3Step contacted the Philadelphia Expo Center to secure the February 14-15, 2026 dates for 3Step's annual Top Court "Prez Day Showdown" tournament over President's Day weekend. Other 3Step employees subsequently reached out to support the relationship with the Philadelphia Expo Center to secure the 2026 renewal dates, only to learn on May 15, 2025, that the venue was already booked for those dates. On May 22, 2025, 3Step learned that the February 14-15, 2026 dates were already rented to Center Court. The annual Prez Day Showdown, operated by 3Step since 2023, and projected to earn more than $100,000 in profit in 2026, is now at risk of cancellation.

134.    Notably and suspiciously, 3Step employees informed Kate Henwood, Vice President of 3Step's Mid-Atlantic Region, that Campion – who was still on 3Step's payroll – had arranged a meeting with representatives of the Philadelphia Expo Center on or about March 4, 2025. On or about the same date, the Philadelphia Expo Center sent a calendar invitation to McCann for March 6, 2025, which was then abruptly cancelled (presumably because McCann discovered it was delivered to his 3Step e-mail account). On information and belief, the purpose

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

of this meeting was for McCann and Campion to solicit the Philadelphia Expo Center venue away from 3Step's events and, instead, to unlawfully and illicitly convert the relationship for the benefit of Defendants. Thus, McCann also tortiously interfered with Campion's employment relationship with 3Step.

135.    Defendants' lack of care and intentional scheme to directly compete with 3Step through the Competing Companies has damaged 3Step's business relationships with facilities and will likely damage 3Step's business if it is unable to secure future key Top Court event dates due to Defendants' actions.

*Misappropriation of 3Step's Trade Secrets and Commercially Confidential Business Information*

136.    3Step takes seriously the confidential and proprietary nature of its trade secrets and commercially confidential information.

137.    3Step uses a number of measures to protect its confidential and proprietary information, including its trade secrets and commercially confidential information.

138.    3Step restricts physical access to its facilities, including by using security guards, cameras, company-issued access badges, and similar security procedures.

139.    3Step restricts access to its computer systems by controlling the devices that can connect to its network, using network security mechanisms and firewalls to protect the information on the network from being exfiltrated, limiting the programs that can be installed on company devices, requiring a user name and strong password to access the company network, and restricting access to files containing proprietary and confidential information about trade secrets and other commercially confidential and proprietary business information to employees with a need to know.

34

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

140.    3Step also requires its employees to execute non-disclosure agreements concerning confidential information and trade secrets.

141.    As was true with each of the McCann Non-Compete, the Reels Confidentiality Agreement, the Smith Confidentiality Agreement, and the Carey Confidentiality Agreement, 3Step requires its employees as part of their employment to sign confidentiality agreements, acknowledging that they will not disclose or use any confidential information of 3Step for their own purposes or for the benefit of any other person.

142.    3Step also typically requires employees leaving the company to participate in an exit interview, during which the employee is reminded of the obligation to protect confidential and proprietary information of 3Step and required to acknowledge in writing that they will not use or disclose any 3Step proprietary information.

143.    And, when 3Step must share confidential information with third parties, including vendors and customers, it protects such disclosure by requiring those parties to sign a non-disclosure agreement before any 3Step confidential information is shared with them.

144.    The information Defendants have taken without authority include, but is not limited to, documents and information related to 3Step's confidential development and marketing strategies, sales and revenue figures and projections, and client and potential client information.

145.    Defendants have used 3Step's confidential information in the marketplace to, among other things, (a) target particular facility and partner relationships to minimize Defendants' costs while maximizing profitability and (b) distribute false or misleading information to 3Step clients and potential clients about 3Step's continued business operations.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

*Defendants' Interference with 3Step's Business Relationships*

146.    Defendants have, directly or indirectly and in concert with third parties including, for example, Campion, contacted certain 3Step employees, business partners, and the sports venues that host Top Court and other 3Step events with the aim of converting their business to Center Court Events.

147.    As one additional example, Defendants interfered with 3Step's partner entity for events in Florida, ROC Enterprises LLC ("ROC"), by failing to provide ROC with timely and contractually mandated profit-and-loss statements. ROC now asserts that 3Step owes it a significant amount of money in revenue share distributions from events dating back to the 2023 season.

148.    In connection with 3Step and ROC's Florida Power Series—valuable in part due to the desirability of Florida as a destination—Carey and Campion failed to renew the facility contracts for both the Broward County and Orange County Convention Centers.

149.    Although ROC helped 3Step regain certain of its contracts with the lost venues, ROC has since notified 3Step that it no longer wishes to partner on the series, putting hundreds of thousands of dollars of the Company's annual gross profit from the Florida Power Series at risk.

*Defendants' Breach of their Duties of Loyalty to 3Step*

150.    With the goal of benefitting the Defendants, collectively, each of McCann, Reels, Smith, and Carey intentionally failed to fulfill basic fiduciary duties of loyalty in performing their employment responsibilities.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

151.    For example, Smith and Reels allowed 3Step's relationships with both the XL Sports facility in Hatfield, Pennsylvania and the United Sports facility in Downingtown, Pennsylvania to deteriorate, and those facilities are now rented to VEVA.

152.    Carey, with Campion, advised 3Step's new Top Court Director to "not take the job because everything is a mess" and even acknowledged that no 2026 venues had been secured, a task that was their responsibility. This was a direct attempt to further impair 3Step's business, even though Carey and Campion themselves were responsible for the "mess" they cited.

153.    Defendants' collectively have leveraged 3Step's trade secrets and commercially confidential business information to directly solicit 3Step's current and prospective clients, including by falsely and wrongly disparaging 3Step to its clients.

154.    Defendants' conduct collectively demonstrates a concerted agreement to intentionally injure 3Step's business and 3Step has been and continues to be damaged.

155.    Upon the termination of their employment, Reels and Campion wiped the data from the computers they were provided by 3Step, effectively *destroying 3Step's data* as stored on those devices—and, on information and belief, attempting to hide their clandestine efforts to sabotage 3Step's business while still employed with 3Step. Smith has yet to return his laptop to 3Step, despite multiple requests from 3Step that he do so.

156.    Similarly, McCann returned his Company-issued laptop with significant physical damage to the screen—damage that was not consistent with ordinary wear and tear, but instead strongly suggests deliberate actions intended to impair the device's functionality and prevent access to the data stored on it.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

157.    Smith and Schott have retained the login credentials to 3Step's social media and AES accounts without returning the accounts to 3Step's control.

## COUNT I
## Breaches of Contract
## (McCann)

158.    3Step incorporates the allegations contained in the preceding paragraphs as if fully set forth here.

159.    As standard practice, 3Step required its employees to sign employment agreements as part of their employment, and departing employees were bound by the non-use, non-solicitation, and/or non-competition provisions of the agreements even after their departure from 3Step.

160.    On or about October 28, 2019, as a condition of his employment with 3Step, McCann executed the McCann Non-Compete by which he acknowledged and agreed that, among other things: (a) he would not use 3Step proprietary information for his own benefit or the benefit of others; (b) during his employment with 3Step and *for a period of two years after* the termination of his employment with 3Step, he would not engage in any activity on behalf of any business or entity that competes, directly or indirectly, with 3Step's business; (c) during his employment with 3Step and for a period of two years after the termination of his employment with 3Step, he would not recruit, solicit, or hire any 3Step employee, consultant, agent, director or officer away from employment with 3Step; and (d) during his employment with 3Step and for a period of two years after the termination of his employment with 3Step, he would not actually or attempt to contact, solicit, divert, or take away any client or accounts, or prospective clients or accounts, of 3Step.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

161.    On or about September 24, 2024, McCann executed the McCann Separation Agreement, by which McCann's employment with 3Step was terminated, 3Step agreed to pay McCann a significant severance payment (in excess of $200,000) as consideration for McCann's agreement to, among other things, (a) continue to be bound by the terms of the McCann Non-Compete and (b) promptly deliver to 3Step all of 3Step's property including, without limitation, all 3Step proprietary information.

162.    The McCann Non-Compete was, and continues to be, valid and enforceable.

163.    The Separation Agreement was, and continues to be, valid and enforceable.

164.    Despite having agreed to abide by the terms of the McCann Non-Compete and the McCann Separation Agreement, McCann has breached multiple provisions of those agreements including, for example, provisions obligating McCann to: (a) not use 3Step's proprietary information for his, or others', benefit; (b) not engage in any activity on behalf of any business or entity that competes, directly or indirectly, with 3Step's business; (c) not recruit, solicit, or hire any 3Step employee, consultant, agent, director, or officer away from employment with 3Step; and (d) not actually or attempt to contact, solicit, divert, or take away any client or accounts, or prospective clients or accounts, of 3Step.

165.    McCann's multiple breaches are the actual and proximate causes of damage and injury to 3Step in an amount to be determined at trial not less than $150,000.

166.    3Step has suffered and, if McCann is left unrestrained, will continue to suffer, irreparable harm as a result of McCann's breach of the terms of the McCann Non-Compete and the McCann Separation Agreement.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

## COUNT II
### Breaches of Duties of Loyalty
### (McCann)

167.    3Step incorporates the allegations contained in the preceding paragraphs as if fully set forth here.

168.    Both during his tenure with 3Step and as a departing employee, McCann owed to 3Step a duty of loyalty by way of his employment at 3Step.

169.    McCann was aware of his fiduciary duties to 3Step.

170.    McCann knew that, among other things, (a) accessing and converting 3Step's trade secrets and other confidential and proprietary information without authorization; (b) using 3Step trade secrets and proprietary information for his own benefit or the benefit of others; (c) acting on behalf of any business or entity that competes, directly or indirectly, with 3Step's business (d) recruiting, soliciting, and/or hiring 3Step employees, consultants, agents, directors and/or officers away from employment with 3Step; and (e) actually or attempting to contact, solicit, divert, or take away any client or accounts, or prospective clients or accounts, of 3Step, each constituted a breach of McCann's duty of loyalty to 3Step.

171.    McCann knowingly and intentionally did, in fact, (a) misappropriate 3Step's trade secrets and other commercially confidential and proprietary information; (b) use that information to accelerate Defendants' establishment of its business operations in direct competition with 3Step; (c) recruit, solicit, and/or hire 3Step employees, consultants, agents, directors and/or officers away from employment with 3Step; and (d) actually or attempt to contact, solicit, divert, or take away any client or accounts, or prospective clients or accounts, of 3Step, all in breach of his duty of loyalty to 3Step.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

172.     As the direct, actual, and proximate result of McCann's actions and/or omissions,
3Step has suffered and continues to suffer damages, as well as irreparable harm and loss, in an
amount to be determined at trial not less than $150,000.

173.     3Step has suffered and, if McCann is left unrestrained, will continue to suffer
irreparable harm as a result of McCann's breach of his fiduciary duty of loyalty to 3Step.

### COUNT III
### Breaches of Contract
### (Reels)

174.     3Step incorporates the allegations contained in the preceding paragraphs as if
fully set forth here.

175.     On or about May 2, 2020, as a condition of continued employment with 3Step,
Reels executed the Reels Confidentiality Agreement, and she also signed the Handbook
acknowledging her understanding of an agreement with the policies and provisions therein.

176.     The Reels Confidentiality Agreement was, and continues to be, valid and
enforceable.

177.     The terms of the Handbook were, and continue to be, valid and enforceable.

178.     Despite having agreed to abide by the terms of the Reels Confidentiality
Agreement and the Handbook, Reels has breached multiple provisions of those agreements
including, for example, the non-use, non-solicitation, and non-competition provisions.

179.     Reels' multiple breaches are the actual and proximate causes of damage and
injury to 3Step in an amount to be determined at trial not less than $150,000.

180.     3Step has suffered and, if Reels is left unrestrained, will continue to suffer,
irreparable harm as an actual and proximate result of Reels' breaches of the terms of the
Handbook and the Reels Confidentiality Agreement.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

## COUNT IV
## Breaches of Duties of Loyalty
### (Reels)

181.    3Step incorporates the allegations contained in the preceding paragraphs as if fully set forth here.

182.    Both during her tenure with 3Step and as a departing employee, Reels owed to 3Step a duty of loyalty by way of her employment at 3Step.

183.    Reels was aware of her fiduciary duties to 3Step.

184.    Reels knew that, among other things, conspiring with the other Defendants to organize the Competing Companies, sabotage 3Step's customer and vendor relationships, convert 3Step customer relationships to the Competing Companies, and accessing and converting 3Step's trade secrets and other confidential and proprietary information without authorization was improper and constituted a breach of her duty to 3Step.

185.    Reels knowingly and intentionally did, in fact, conspire and act in concert with the other Defendants to organize the Competing Companies, sabotage 3Step's customer and vendor relationships, convert and attempt to convert 3Step customer relationships to the Competing Companies, and access and convert 3Step's trade secrets and other confidential and proprietary information without authorization, all in breach of her duty of loyalty to 3Step.

186.    As a direct, actual, and proximate result of Reels' actions and/or omissions, 3Step has suffered and continues to suffer damages, as well as irreparable harm and loss, in an amount to be determined at trial not less than $150,000.

187.    3Step has suffered and, if Reels is left unrestrained, will continue to suffer irreparable harm as a result of Reels's breaches of her fiduciary duty of loyalty to 3Step.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

## COUNT V
### Breaches of Contract
### (Smith)

188.    3Step incorporates the allegations contained in the preceding paragraphs as if fully set forth here.

189.    On or about May 5, 2020, Smith, as a condition and part of his consideration for his employment with 3Step, signed the Smith Confidentiality Agreement and the Handbook by which he agreed that upon termination of his employment, he would surrender all proprietary information or data to 3Step and that he was not retaining any copies or notes concerning the commercially confidential 3Step proprietary information and/or trade secrets.

190.    The Smith Confidentiality Agreement was, and continued to be, valid and enforceable.

191.    The terms of the Handbook were, and continue to be, valid and enforceable.

192.    Despite having agreed to abide by the terms of the Smith Confidentiality Agreement and the Handbook, Smith has breached multiple provisions of those agreements including, for example, the non-use, non-solicitation, return of property, and non-competition provisions.

193.    Smith's breaches are the actual and proximate causes of damage and injury to 3Step in an amount to be determined at trial not less than $150,000.

194.    3Step has suffered and, if Smith is left unrestrained, will continue to suffer irreparable harm as a result of Smith's breaches of the terms of the Handbook and the Smith Confidentiality Agreement.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

## COUNT VI
## Breaches of Duties of Loyalty
### (Smith)

195.    3Step incorporates the allegations contained in the preceding paragraphs as if fully set forth here.

196.    Both during his tenure with 3Step and as a departing employee, Smith owed to 3Step duties of loyalty by way of his employment at 3Step.

197.    Smith was aware of his fiduciary duties to 3Step.

198.    Smith knew that, among other things, conspiring with the other Defendants to organize VEVA, sabotage 3Step's facility, customer, and vendor relationships, convert 3Step customer relationships to VEVA, and accessing and converting 3Step's trade secrets and other confidential and proprietary information without authorization was improper and constituted a breach of his duty to 3Step.

199.    Smith knowingly and intentionally did, in fact, conspire with the other Defendants to organize VEVA, sabotage 3Step's customer and vendor relationships, convert and attempt to convert 3Step customer relationships to VEVA, and access and convert 3Step's trade secrets and other confidential and proprietary information without authorization, all in breach of his duty of loyalty to 3Step.

200.    As a direct, actual, and proximate result of Smith's actions and/or omissions, 3Step has suffered and continues to suffer damages, as well as irreparable harm and loss, in an amount to be determined at trial not less than $150,000.

201.    3Step has suffered and, if Smith is left unrestrained, will continue to suffer irreparable harm as a result of Smith's breach of his fiduciary duty to 3Step.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

## COUNT VII
## Breaches of Contract
## (Carey)

202.     3Step incorporates the allegations contained in the preceding paragraphs as if fully set forth here.

203.     On or about September 18, 2020, Carey, as part of the consideration for and a condition of her employment, signed the Carey Confidentiality Agreement with 3Step which indicated that upon termination of her employment, she had surrendered all proprietary information or data to 3Step and that he was not retaining any copies or notes concerning the commercially confidential 3Step proprietary information and/or trade secrets.

204.     That agreement was, and continued to be, valid and enforceable.

205.     Despite having agreed to abide by the non-use, non-solicitation, and non-competition terms of the agreement, after the termination of her employment at 3Step, Carey unlawfully retained 3Step's trade secrets and confidential and proprietary information including, but not limited to, client lists, prospective client lists, client financial information, competition strategy and marketing information, and pricing information.

206.     Carey, individually and/or with the other Individual Defendants, unlawfully transferred 3Step's trade secrets and commercially confidential and proprietary information to the Competing Companies and improperly used 3Step's information for the economic benefit of herself and the other Defendants.

207.     Carey's breaches are the actual and proximate causes of damage to 3Step in an amount to be determined at trial not less than $150,000.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

208.    3Step has suffered and, if Carey and the other Defendants are left unrestrained, will continue to suffer irreparable harm as a result of Carey's breaches of the terms of the employment agreement with 3Step.

### COUNT VIII
### Breaches of Duties of Loyalty
### (Carey)

209.    3Step incorporates the allegations contained in the preceding paragraphs as if fully set forth here.

210.    Both during her tenure with 3Step and as a departing employee, Carey owed to 3Step duties of loyalty by way of her employment at 3Step.

211.    Carey was aware of her fiduciary duties to 3Step.

212.    Carey knew that, among other things, conspiring with the other Defendants to organize VEVA and Center Court, sabotage 3Step's facility, customer, and vendor relationships, convert 3Step customer relationships to the Competing Companies, and accessing and converting 3Step's trade secrets and other confidential and proprietary information without authorization was improper and constituted a breach of her duty to 3Step.

213.    Carey knowingly and intentionally did, in fact, conspire with the other Defendants to organize the Competing Companies, sabotage 3Step's customer and vendor relationships, convert and attempt to convert 3Step customer relationships to the Competing Companies, and access and convert 3Step's trade secrets and other confidential and proprietary information without authorization, all in breach of her duty of loyalty to 3Step.

214.    As a direct, actual, and proximate result of Carey's actions and/or omissions, 3Step has suffered and continues to suffer damages, as well as irreparable harm and loss, in an amount to be determined at trial not less than $150,000.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

215.    3Step has suffered and, if Carey is left unrestrained, will continue to suffer irreparable harm as a result of Carey's breaches of her fiduciary duty to 3Step.

## COUNT IX
### Breaches of Contract
### (Schott)

216.    3Step incorporated the allegations contained in the preceding paragraphs as if fully set forth here.

217.    On or about August 8, 2022, Schott, as a condition of his employment, signed the Schott Confidentiality Agreement with 3Step which indicated that upon termination of his employment, he had surrendered all proprietary information or data to 3Step and that he was not retaining any copies or notes concerning the commercially confidential 3Step proprietary information and/or trade secrets.

218.    That agreement was, and continued to be, valid and enforceable.

219.    Despite having agreed to abide by the non-use, non-solicitation, and non-competition terms of the agreement, after the termination of his employment at 3Step, Schott unlawfully retained 3Step's trade secrets and confidential and proprietary information including but not limited to, client lists, prospective client lists, client financial information, competition strategy and marketing information, and pricing information.

220.    Schott also breached the Schott Confidentiality Agreement by directly soliciting 3Step employees to leave employment with 3Step and join the Competing Companies.

221.    Schott, individually and/or with the other Individual Defendants, unlawfully transferred 3Step's trade secrets and commercially confidential and proprietary information to the Competing Companies and improperly used 3Step's information for the economic benefit of himself and the other Defendants.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

222.    As a direct, actual, and proximate result of Schott's actions and/or omissions, 3Step has suffered and continues to suffer injuries and damages, as well as irreparable harm and loss, in an amount to be determined at trial not less than $150,000.

223.    3Step has suffered and, if Schott and the other Defendants are left unrestrained, will continue to suffer irreparable harm as a result of Schott's breaches of the terms of the employment agreement with 3Step.

## COUNT X
### Breaches of Duties of Loyalty
### (Schott)

224.    3Step incorporates the allegations contained in the preceding paragraphs as if fully set forth here.

225.    Both during his tenure with 3Step and as a departing employee, Schott owed to 3Step a duty of loyalty by way of his employment at 3Step.

226.    Schott was aware of his fiduciary duties to 3Step.

227.    Schott knew that, among other things, conspiring with the other Defendants to organize Center Court, sabotage 3Step's coach, employee, facility, customer, and vendor relationships, convert 3Step customer relationships to the Competing Companies, and accessing and converting 3Step's trade secrets and other confidential and proprietary information without authorization was improper and constituted a breach of his duty to 3Step.

228.    Schott knowingly and intentionally did, in fact, conspire with the other Defendants to organize Center Court, sabotage 3Step's customer, coach, employee, and vendor relationships, convert and attempt to convert 3Step customer relationships to the Competing Companies, and access and convert 3Step's trade secrets and other confidential and proprietary information without authorization, all in breach of his duty of loyalty to 3Step.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

229.    As a direct, actual, and proximate result of Schott's actions and/or omissions, 3Step has suffered and continues to suffer injuries and damages, as well as irreparable harm and losses, in an amount to be determined at trial not less than $150,000.

230.    3Step has suffered and, if Schott is left unrestrained, will continue to suffer irreparable harm as a result of Schott's breaches of his fiduciary duty to 3Step.

**Count XI**
**Tortious Interference with Existing and Prospective Business Relations**
**(All Defendants)**

231.    3Step incorporates the allegations contained in the preceding paragraphs as if fully set forth here.

232.    Defendants have engaged and continue to engage in the enticement of, solicitation of, and acceptance of business from 3Step's customers.

233.    Defendants each knew of the relationship between 3Step and its customers by way of at least McCann, Reels, Smith, and Carey's employment at 3Step.

234.    After misappropriating 3Step's trade secrets and other confidential and proprietary information and using such information to develop competing programs and services and identify current and prospective 3Step clients, Defendants have marketed, offered for sale, and sold such programs and services to active 3Step customers.

235.    Defendants' interference with the relationship between 3Step and its customers was improper in motive and means, as Defendants leveraged 3Step's trade secrets and other commercially confidential and proprietary information to develop VEVA's program and service offerings that directly compete with 3Step's programs and services thereby targeting these customers with the purpose of taking business from 3Step.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

236.    Defendants' conduct was and is willful, intentional, and calculated to cause damage to 3Step.

237.    As a direct, actual, and proximate result of Defendants' actions and/or omissions, 3Step has suffered and continues to suffer loss of advantage in the market, which is demonstrated by 3Step's loss of sales and price erosion, in an amount to be determined at trial not less than $150,000.

238.    3Step has suffered and will continue to suffer irreparable harm as a result of Defendants' tortious interference with 3Step's existing and prospective business relationships if they are left unrestrained.

**COUNT XII**
**Misappropriation of Trade Secrets under the**
**Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.***
**(All Defendants)**

239.    3Step incorporates the allegations contained in the preceding paragraphs as if fully set forth here.

240.    The trade secret information, which is owned by 3Step, comprises confidential customer and sales-related information, including customer identities, needs, requirements, opportunities, and challenges, product pricing, volume expectations, customer purchase forecasts, and marketing and sales strategies.

241.    The trade secret information misappropriated by Defendants satisfies the definition of "trade secret" under 18 U.S.C. § 1839(3).

242.    Each of the trade secrets at issue is used in the development of or in connection with 3Step's products and services, all of which are marketed and sold in interstate commerce.

243.    3Step has taken reasonable steps to ensure the confidentiality of its trade secrets such as disclosing such information only to necessary persons, requiring its employees to execute

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

and abide by confidentiality agreements as part of their employment, requiring third parties to execute and abide by non-disclosure agreements in the course of business, securing its physical facilities, and protecting its networks and digital information with security protocols, passwords, firewalls, encryption, and software.

244.    Upon information and belief, Defendants have knowingly and intentionally stolen and misappropriated trade secrets taken from 3Step by McCann, Reels, Smith, and Carey without authorization by way of their employment at 3Step.

245.    To this day, the Competing Companies continue to use 3Step's trade secrets in bringing to market products and services that directly compete with 3Step's products and services and in targeting specific 3Step customers for sales based on such trade secret information.

246.    As a direct, actual, and proximate result of Defendants' misappropriation, 3Step has suffered, and continues to suffer, substantial damages, which include but are not limited to lost sales and price erosion.

247.    3Step has suffered and will continue to suffer irreparable harm as a result of Defendants' unlawful misappropriation if they are left unrestrained.

**COUNT XIII**
**Misappropriation of Trade Secrets in Violation of**
**Pennsylvania Uniform Trade Secrets Act, 12 PA C.S.A. § 5301, *et seq.***
**(All Defendants)**

248.    3Step incorporates the allegations contained in the preceding paragraphs as if fully set forth here.

249.    The trade secret information which is owned by 3Step comprises confidential customer and sales-related information, including customer identities, needs, requirements,

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

opportunities, and challenges, product pricing, volume expectations, customer purchase forecasts, and marketing and sales strategies.

250.    3Step's confidential and proprietary information has actual and potential independent economic value as a result of not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure and use.

251.    3Step has taken reasonable steps to ensure the confidentiality of its trade secrets such as disclosing such information only to necessary persons, a) requiring it employees to execute and abide by confidentiality agreements as part of their employment, b) requiring third parties to execute and abide by non-disclosure agreements in the course of business, c) securing its physical facilities, and d) protecting its networks and digital information with security protocols, passwords, firewalls, encryption, and software.

252.    Upon information and belief, Defendants have intentionally and knowingly stolen and unlawfully misappropriated trade secrets taken from 3Step by McCann, Reels, Smith, Carey, and others—known and unknown—without authorization by way of their employment with 3Step.

253.    Defendants knew or had reason to know that 3Step's trade secrets and confidential and proprietary information were acquired by improper means and otherwise misappropriated, disclosed or used the confidential information as defined by 12 Pa. C.S.A. § 5302.

254.    To this day, Defendants continue to use 3Step's trade secrets in bringing to market products and services that directly compete with 3Step's products and services and in targeting specific 3Step customers for sales based on such trade secret information.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

255.     As a direct, actual, and proximate result of Defendants' misappropriation, 3Step has suffered, and continues to suffer, substantial injuries and damages, which include but are not limited to lost sales and price erosion.

256.     3Step has suffered and will continue to suffer irreparable harm as a result of Defendants' misappropriation if they are left unrestrained, in an amount to be determined at trial not less than $150,000.

## COUNT XIV
### Equitable Claim for Inevitable Disclosure
### (All Defendants)

257.     3Step incorporates the allegations contained in the preceding paragraphs as if fully set forth here.

258.     The Individual Defendants each had access to 3Step's highly confidential, proprietary, and trade secret information by virtue of their prior employment with 3Step, including without limitation, strategic business plans, customer and vendor relationships, pricing models, operational protocols, financial data, marketing strategies, and upcoming program offerings.

259.     The Individual Defendants—individually and collectively—possess detailed, non-public knowledge of 3Step's inner workings that was developed and maintained through significant investment and over many years of operation.

260.     The Defendants have formed and are operating entities that are in direct competition with 3Step in the youth sports and volleyball industries. Upon information and belief, the business models, operations, and marketing of the Competing Companies mimic, to a substantial degree, those of 3Step.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

261.    Because of the Individual Defendants' former roles at 3Step and the nature of the confidential information to which they had access, Defendants' current and ongoing activities on behalf of the Competing Companies will likely result in the use and disclosure of 3Step's confidential and proprietary information and trade secrets, even in the absence of direct evidence of such use or disclosure at this time.

262.    As such, the disclosure and use of 3Step's confidential, proprietary, and trade secret information by the Defendants is not merely speculative but is likely and, therefore, inevitable.

263.    3Step has taken reasonable steps to preserve the confidentiality of its proprietary information and trade secrets, and such information derives independent economic value from not being generally known or readily ascertainable by others.

264.    3Step has no adequate remedy at law because damages alone cannot fully compensate for the competitive harm that will result from the inevitable use or disclosure of its confidential and proprietary information by Defendants in direct competition with 3Step.

265.    Unless enjoined, Defendants will continue to benefit from the inevitable disclosure of 3Step's trade secrets and proprietary information, and 3Step will suffer irreparable harm.

266.    Accordingly, 3Step is entitled to injunctive relief enjoining Defendants from continuing their employment with, ownership in, or direct or indirect support of any business that competes with 3Step for a reasonable period of time and within a reasonably defined geographic area sufficient to prevent the inevitable disclosure of 3Step's confidential and proprietary information.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

## COUNT XV
## Computer Fraud, 18 U.S.C. § 1030
## (All Defendants)

267.    3Step incorporates the allegations contained in the preceding paragraphs as if fully set forth here.

268.    Defendants, jointly and in concert with each other, knowingly and with intent to defraud 3Step, accessed without authority and/or exceeded authorized access to 3Step's protected computers and digital systems and by such access obtained without authority valuable 3Step trade secrets and other commercially confidential and proprietary information.

269.    For example, McCann during his employment with 3Step, improperly and without authorization, via 3Step's computer systems, accessed and misappropriated 3Step trade secrets and other highly confidential commercial business information such as, for example, client and prospective client information, and, at least as early as May 2024, used 3Step's time and resources to pursue third-party endeavors and investments for McCann's personal gain such as, for example, repeatedly meeting, and ultimately, investing with third-parties to establish a new competing volleyball, basketball, and pickleball facility in South Strabane Township, Pennsylvania.

270.    Defendants, acting jointly and maliciously, deleted or destroyed 3Step files and information on company-issued computers, including a) Reels's unauthorized wiping of her laptop; b) Smith's continued refusal to return his laptop despite multiple requests by 3Step; and c) McCann's return of a laptop with a severely damaged screen, thereby disrupting 3Step's operations and impairing its access to critical information.

271.     Defendants' interference with 3Step's social media account access is another example of Defendant's malicious and fraudulent conduct perpetrated on 3Step via protected

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

computer systems. Smith, indirectly or directly, managed 3Step's social media accounts for ECP
—including, for example, its @ecpowervball Instagram account, @ECPowerVBall X account
and "East Coast Power Volleyball" Facebook account—to his personal email or unapproved
Gmail addresses rather than 3Step-owned email accounts. Smith did not transfer access to any of
these ECP social media accounts to 3Step upon the termination of his employment, even upon
3Step's direct and repeated requests that he do so, and, to date, 3Step has not been able to regain
access to more than twenty of its ECP-branded Instagram, X, Facebook and TikTok accounts.
Similarly, Schott directly managed 3Step's social media accounts for Top Court —including, for
example, its @topcourtjack Instagram account —by connecting the accounts to his personal
email rather than 3Step-issued email accounts. Schott did not transfer access to Top Court social
media accounts to 3Step upon the termination of his employment, even upon 3Step's direct
request that he do so, and, to date, 3Step has not been able to regain access to this account.

     272.    Defendants' malicious and fraudulent conduct is also evidenced by Defendants
having effectively frozen out 3Step from accessing its ECP AES portal and continued retention
without authorization of 3Step's account credentials.

     273.    Defendants' malicious and fraudulent conduct is also evident in Defendants, on
information and belief, causing an electronic communication to be sent to 3Step's ECP Delaware
families falsely claiming that the ECP Delaware division was "rebranding" to VEVA.

     274.    To this day, Defendants intentionally, fraudulently, and maliciously continue to
use and/or maintain control of, without authorization, multiple of 3Step's social media accounts,
its ECP AES Account, and the login credentials for various 3Step computers.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

275.     As a direct, actual, and proximate result of Defendants' conduct, 3Step has

suffered, and continues to suffer, substantial injuries and damages, which include but are not

limited to significant reputational harm and interference with 3Step's business relations.

276.     3Step has suffered and will continue to suffer irreparable harm as a result of

Defendants' misappropriation if they are left unrestrained.

## COUNT XVI
## Unjust Enrichment, in the alternative
## (All Defendants)

277.     3Step incorporates the allegations contained in the preceding paragraphs as if

fully set forth here.

278.     As a result of Defendants' conduct and misappropriation of 3Step's trade secrets

and confidential and proprietary information, 3Step has suffered economic detriment and

Defendants have received and appreciated benefits, such as accelerated development of products

and services, new sales, and customer and vendor contracts, to which they would not otherwise

be entitled.

279.     Defendants knew that they would reap such benefits by misappropriating and

subsequently using 3Step's trade secrets and confidential and proprietary information to release

products and services via the Competing Companies that directly compete with 3Step's existing

products and services in the market.

280.     Under the circumstances and because 3Step and the Competing Companies are

direct competitors, Defendants' acceptance and retention of such benefits without payment of

value to 3Step is inequitable.

281.     3Step has suffered and will continue to suffer irreparable harm as a result of

Defendants' conduct and misappropriation of 3Step's trade secrets and confidential and

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

proprietary information if Defendants are left unrestrained, in an amount to be determined at trial not less than $150,000.

## COUNT XVII
### Conspiracy as to All Tort Claims Asserted Herein
### (All Defendants)

282.    3Step incorporates the allegations contained in the preceding paragraphs as if fully set forth here.

283.    The Individual Defendants each combined and agreed with each other and/or others, known and unknown, and with the Competing Companies, to misappropriate 3Step's trade secrets and other confidential and proprietary business information in order to, *inter alia*, unjustly enrich themselves, to interfere with 3Step's actual and potential business relations, and to unlawfully recruit 3Step employees, all to 3Step's detriment.

284.    Each Individual Defendant committed at least one overt act in furtherance of this conspiracy, and the Competing Companies by and through the conduct of the Individual Defendants similarly committed at least one overt act in furtherance of the conspiracy including, for example, unlawfully recruiting other 3Step employees, unlawfully soliciting 3Step's current and potential clients, and converting and misappropriating 3Step's trade secrets and other confidential and proprietary information.

285.    Each Defendant acted with the common intent to injure 3Step and understood that each other Defendant shared in that common purpose.

286.    Defendants' conduct was intentional, willful, and malicious.

287.    3Step has suffered and will continue to suffer irreparable harm as a result of Defendant's unlawful conspiracy if Defendants are left unrestrained, in an amount to be determined at trial not less than $150,000.

58

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

**COUNT XVIII**
**Equitable Accounting**
**(All Defendants)**

288.    3Step incorporates the allegations contained in the preceding paragraphs as if fully set forth here.

289.    Reels, Smith, and Carey's roles with the Competing Companies support the fact that Reels, Smith, and Carey have materially breached their respective contractual and common law duties as described more fully above.

290.    Upon information and belief, 3Step therefore avers that, at least, the Competing Companies, Reels, Smith, and Carey are in possession of information necessary to calculate all amounts due to 3Step arising from the breaches of said contractual and common law duties herein at issue.

291.    3Step is entitled to a complete accounting of the intellectual property, trade secrets, commercially confidential business information or other intangible property of 3Step, as well as any and all profits earned by any Defendant derived therefrom and in dispute herein in order to fully calculate its damages.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff 3Step respectfully requests that this Court enter judgment as follows:

1.     Declaring that the Competing Companies and the Individual Defendants, jointly and severally, are liable on each of the respective Counts set forth above.

2.     Allowing an equitable accounting on Count XVIII, along with reasonable attorneys' fees, costs, and such other relief as the Court deems just and proper;

3.     Awarding 3Step judgment in an amount in excess of $150,000 against all Defendants, jointly and severally, to be determined at trial inclusive of, among other things, all compensatory damages, consequential damages, and lost profits adequate to compensate for the Competing Companies' and the Individual Defendants' activities, including supplemental damages where permitted, together with reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest at 6% per annum on the judgment awarded;

4.     For an injunction to issue, preliminarily until final hearing and permanently thereafter:

a.     Enjoining and restraining the Competing Companies and the Individual Defendants from misappropriating 3Step's trade secrets and related confidential and proprietary information, including by acquiring, using, or disclosing the misappropriated trade secrets and related confidential and proprietary information;

b.     Restraining the Individual Defendants, the Competing Companies, and their agents from destroying any and all files or documents wrongfully obtained from 3Step that are currently in their possession;

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

c.    Ordering the Individual Defendants, the Competing Companies, and their agents to return to 3Step any and all documents, plans, protocols, client, or employee information and tangible or intangible records of 3Step in their possession, including all copies and adaptations of such documents, data, information, and records, 24 hours of notice to Defendants or their counsel of the terms of an order by the Court;

d.    Ordering the Individual Defendants, the Competing Companies and their agents to return to 3Step any and all confidential information pertaining to the clients or business operations of 3Step, whether in original, copied, computerized, handwritten, or any other form, and to purge any such information from their possession, custody, or control, within twenty-four hours of notice to Defendants or their counsel of the terms of an order by the Court;

e.    Directing each Individual Defendant and the Competing Companies to file with the Court and serve on 3Step within 30 days after the service on Defendants of such injunction a report in writing, under oath, setting forth the manner and form in which the Competing Companies and each respective Individual Defendant have complied with the injunction and returned 3Step's property;

f.    Enjoining and restraining the Individual Defendants and the Competing Companies from unfairly competing with 3Step; and

g.    Enjoining and restraining the Individual Defendants and the Competing Companies from tortiously interfering with the existing and prospective business relations of 3Step;

5.    For general, compensatory and consequential damages in an amount to be determined at trial;

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

6.      For punitive and/or exemplary damages on all claims and as permitted by statute;

7.      For disgorgement of all ill-gotten gains the Competing Companies and/or the Individual Defendants have unjustly attained by their illegal acts;

8.      For pre-judgment and post-judgment interest at that statutory 6% per annum rate;

9.      For an order awarding 3Step its attorneys' fees and costs; and

10.     For an order awarding 3Step such other and further relief as the Court deems just and proper.

**JURY DEMAND**

3Step hereby demands a trial by jury on all issues so triable.

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

Dated: June 3, 2025                     Respectfully submitted,


                                        _/s/ John J. Jacko, III_____
                                        John J. Jacko, III
                                        **LEECH TISHMAN FUSCALDO & LAMPL LLC**
                                        1417 Locust Street, 3rd Floor
                                        Philadelphia, PA 19102
                                        Telephone: 267-938-4560
                                        jjacko@leechtishman.com

                                        and

                                        Marc C. Laredo (*pro hac vice* to be submitted)
                                        Brendan S. Cox (*pro hac vice* to be submitted)
                                        Darshana Indira (*pro hac vice* to be submitted)
                                        William G. Cosmas (*pro hac vice* to be submitted)
                                        **LAREDO, SMITH & KANE LLP**
                                        101 Federal Street, Suite 650
                                        Boston, MA 02110
                                        (617) 443-1100
                                        laredo@laredosmith.com
                                        cox@laredosmith.com
                                        indira@laredosmith.com
                                        cosmas@laredosmith.com

                                        *Attorneys for Plaintiff*
                                        ***3 STEP SPORTS LLC***

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

## **<u>VERIFICATION</u>**

I, Greg Waldbaum, hereby state on my oath that I have reviewed the allegations contained in the above Verified Complaint, and the facts set forth therein are true based on my own personal knowledge, except for those allegations made on information and belief, and as to those I believe them to be true.

Sworn under the penalties of perjury on this 3rd day of June, 2025.


*Greg Waldbaum*

_____
Greg Waldbaum, President of
3 Step Sports LLC

Doc ID: 9c980dbb70012ce96b329f924688ea63c489f6ab

**✖ Dropbox** Sign                                                    Audit trail

| | |
|---|---|
| **Title** | 2025-06-03 - PA Complaint [final].pdf |
| **File name** | 2025-06-03%20-%20...20%5Bfinal%5D.pdf |
| **Document ID** | 9c980dbb70012ce96b329f924688ea63c489f6ab |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

**This document was requested from app.clio.com**

## Document History

|  | | |
|---|---|---|
| ⟳ SENT | **06 / 03 / 2025** 17:27:17 UTC | Sent for signature to Greg Waldbaum (greg.waldbaum@threestep.com) from indira@laredosmith.com IP: 71.233.99.139 |
| 👁 VIEWED | **06 / 03 / 2025** 17:49:20 UTC | Viewed by Greg Waldbaum (greg.waldbaum@threestep.com) IP: 188.241.249.140 |
| ✎ SIGNED | **06 / 03 / 2025** 17:50:35 UTC | Signed by Greg Waldbaum (greg.waldbaum@threestep.com) IP: 50.247.168.59 |
| ⊘ COMPLETED | **06 / 03 / 2025** 17:50:35 UTC | The document has been completed. |